The next case for oral argument this morning is Appeal No. 25-2134, Ballard Spahr v. Official Committee of Equity Security Holders. Good morning, Mr. Summers. Good morning, Your Honor. Matthew Summers. May it please the Court, Matthew Summers on behalf of Appellant Ballard Spahr LLP. This case involves a proof of claim amount of just under $237,000 that Ballard Spahr filed in the Greenpoint Tactical Income Fund bankruptcy case before the Eastern District of Wisconsin and an objection that the Equity Committee filed to that claim and the Bankruptcy Court granting summary judgment to the Equity Committee and the District Court affirming on the first leg of the appellate process. Much of this appeal turns on whether the declaration by Ballard, submitted by Ballard Spahr, one of its partners, David Axelrod, and the other documentary evidence was sufficient to create an issue of material fact such that the Bankruptcy Court's decision to grant summary judgment was improper. Mr. Summers, before we get too far into the merits, I have to say I'm a little bit troubled by your representation in your brief that so far the SEC and DOJ investigations, quote, have resulted in no finding of or judgment for liability for any wrongdoing to date. And we have the 2002 SEC case where the jury found that Hull and the other defendants were liable. In 2025, before you filed your brief, where the court was very strong in imposing specific remedies, noting joint several liability was warranted because these entities were used to collect fraudulently inflated management fees and other unwarranted charges, had some very strong language of liability. Yes, Your Honor, there was. And that statement in the brief was, we believe, to be true at the time, but clearly we were unaware of the proceedings that had followed. Well, the 2022 jury verdict in the SEC case was several years before you filed your brief. And the district court's ruling about the conduct and imposing the remedies was before you filed your brief. So I just find that statement troubling because it's not correct. It was not correct, Your Honor. It was not. And I think it should not have been in the brief. And I think that with the passage of time, our engagement on behalf of Mr. Hull had ended around 2019, around the time of the bankruptcy case. You get my point. You're filing a brief. You are responsible for the statements in it. I do understand your point, yes. Yes, Your Honor. And I apologize. It should not have been in there. I think on the merits, Your Honor, the lower courts assumed that there was an oral agreement here from the debtor to pay Ballard's fees. And that's supported by David Axelrod's declaration, which was submitted in connection with summary judgment. And the debtor, in fact, paid 10 Ballard invoices during the pre-petition period. And all the evidence we submitted, Your Honor, there was sufficient evidence here from the declaration to support an oral agreement and that there was an original undertaking by the debtor to pay the fees. And it was not simply a guarantee. And that distinction matters to this case because the statute of frauds in Wisconsin requires that a guarantee has to be in writing and subject to the statute of frauds. And if it was an original undertaking by the debtor, then it would not need to be in writing. Why didn't the firm just execute an agreement with Greenpoint to pay the fees? Yeah, so... And a second one or a supplemental one. I understand missing it the first time around. Fine. But then later. Yeah. So I think that the... I think Mr. Axelrod is correct that I think there was custom to ask for an agreement to pay. I know that it was not... I don't think it was regularly documented in signatures. I think sometimes it was, sometimes it was not. In this case, it was not. And I think there are any number of reasons for that. I think attorneys were thinking about the engagement letters being with the client and the agreement to pay from an indemnification provision or someone else on the corporate side was not part of the actual engagement letter or the agreement between our client and between our client and the firm. And I think also sometimes you get into issues with DNO. Not the case here, but in other cases you can get into issues with DNO insurance and things of that nature that might make it an instance where you might not necessarily want or need to obtain the signature. I think probably the better practice would have been to obtain the signature either as a supplement to the engagement letter or otherwise. That's not what happened here. And I don't think it's actually that uncommon, at least it wasn't at the time, for these circumstances where you're representing a director and officer not to obtain some writing from the company. Has your client made any attempt to collect this money from Mr. Hall? I'm not aware of any attempt to collect from Mr. Hall since the bankruptcy case was filed. I believe the view is that Mr. Hall is unable to pay. And the view was he was likely unable to pay at the time of the engagement, which is why Mr. Axelrod made sure that Greenpoint, the debtor, would pay or would agree to pay. If he was unable to pay at the time of the engagement, that seems like an even stronger argument that your client should have had a written agreement. Well, I think you could look at it that way, but you could also look at it as, I think many times directors and officers of companies do not have the ability to pay and are looking to the company which employs them to pay. And that's why you have D&O Insurance in some instances and that's why you have this agreement. So I think you could look at it the other way as well. You are into your rebuttal time, if you want to save any. I am. It's up to you. Maybe I'll just go to maybe the two-minute mark here. I think what the lower courts did with the Axelrod Declaration, I think, is they read it in the light least favorable to Ballard's bar and that there really was never a dispute about the obligation to pay until the equity committee, the predecessor to the appellee here, made until they objected. And I think that there are instances where the district court went on about the engagement being perhaps by just one of the two managing members of the debtor when Mr. Axelrod's declaration clearly says he was engaged by the members plural. And I think that there's repeatedly the Axelrod Declaration is just read in the most negative light rather than the most favorable light. I will save the remainder of my time.  Thank you. Thank you. Ms. Jansen. Thank you, Your Honor. May it please the court. This is an appeal brought by Ballard's bar in which it seeks to collect its legal fees from the bankruptcy estate of the Greenpoint Tactical Income Fund. The facts on appeal and at the summary judgment stage were not contested. For the purposes of summary judgment, there is no dispute that Greenpoint was not Ballard's client. Greenpoint did not have a written agreement with Ballard to pay its fees. It was Michael Hull and his separate investment advisory firm, Bluepoint, that were Ballard's only clients. Ballard had two separate written engagement letters with Mr. Hull for which Mr. Hull agreed to be responsible for payment of Ballard's fees. And those took place approximately five months apart, August 2017, January 2018. That second engagement letter required Mr. Hull to pay a retainer to Ballard. There was no mention of Greenpoint in that engagement letter or Greenpoint's responsibility to pay that retainer. It's unknown whether the retainer was paid, but it certainly wasn't paid by Greenpoint. If it was, that's not on the record. I take all that, but if there was no understanding that Greenpoint would pay the fees, why did they pay so many invoices? What was that about? Your Honor, I would be speculating because I don't personally know. I represent the equity investors. We represented the Equity Committee during the bankruptcy case. I now represent the Governance Board, who's the successor in interest to those equity investors. But I think if you think about it and you look at the district court's opinion in the remedies decision that was issued in September of 2015, there's a paragraph that talks about the self-dealing that the managing members engaged in, the managing members being the two LLCs, Chrysalis Financial, which was controlled by Mr. Knoll, and GAM II, which was controlled by Mr. Hull. Quite frankly, Your Honor, I think that it was just very simple for Mr. Hull to use the investment fund and use the investor's money to pay his personal expenses. The judge and jury in that case specifically found that the managing members and Mr. Hull and Mr. Knoll had engaged in self-dealing. I think maybe that's where that's coming from. There's also no dispute that Ballard sent its invoices to Mr. Hull at the address in Madison, Wisconsin, of one of his other businesses called Greenpoint Asset Management No. 2, and that Greenpoint's business address was in Milwaukee. So the invoices themselves were sent to Mr. Hull, not to Greenpoint. Mr. Hull was also not a managing member. The managing members were LLCs. They were controlled by individuals, of course, but I won't spend too much time on the indemnification obligations, but those obligations under the LLC Act and under the operating agreement clearly only apply to members or managing members for which Mr. Hull was neither. Still, Ballard is seeking to collect its claim against Greenpoint, ultimately at the expense of the innocent investors whom Hull was found by a jury to have defrauded in the SEC civil action. Ballard asked this court to reverse the rulings of two prior courts, Judge Halfinger at the bankruptcy court and Judge Pepper at the district court, that carefully applied Wisconsin law to the factual record and correctly concluded that Ballard had not met its burden as the non-moving party on summary judgment to adduce sufficient evidence from which a reasonable fact finder could enter judgment in its favor. It's important, I think, on appeal, Your Honor, to remember that this is really about burdens and standards. Ballard did not meet its burden as the non-moving party to offer sufficient evidence to survive summary judgment. With respect to—there's three theories. There's the oral contract, there's promissory stoppel, and indemnification. With respect to the oral contract, the district court and the bankruptcy court both found Ballard did not offer sufficient evidence to meet its burden that any promise made by Greenpoint actually falls outside the statute of frauds. In its briefs, Ballard's bar attempts to overcome that burden and its evidentiary deficiencies by stretching the bounds of the statements in the Axelrod Declaration well beyond what can reasonably be inferred and asking this court to speculate and fill in the blanks in its favor. In short, Ballard is asking for this court and prior courts to interpret and apply facts that it wishes were in the record but aren't and seeks a second bite at the apple to go to trial, likely to introduce additional facts to support its claim. But on summary judgment, the standard for a non-moving party to survive summary judgment is that a reviewing court must take the record as it is and affirm if no reasonable trier of fact would render a verdict for the non-moving party, Ballard, if the records were identical. The dispositive inquiry with respect to the statute of frauds is whether the promise was intended to make the promise or primarily liable. So here, whether a promise by Greenpoint was intended to make Greenpoint primarily liable, that's the prized state case from the Seventh Circuit cited in our briefs. Ballard relies almost exclusively on the Axelrod Declaration, a few short paragraphs, paragraphs 10 through 13 in that declaration, which are sparse in conclusory and provide very little evidence of what promise, if any, was made. Who made that promise? It says the managing members, but as we know, managing members were LLCs, and it seems that Ballard has changed its version of events somewhat on appeal and is now saying, well, the promise was made by Hull. Well, Hull wasn't a managing member, and Hull is not the managing members plural. So even Ballard's own arguments and evidence are contradictory. There's no evidence that the person who made the promise had the authority to do so. Ballard cites to Section 6.4 of the operating agreement, but if you look, I think it's 6.4d. The authority to enter into contracts applies to routine contracts. I would submit that it is not a routine contract to enter into an agreement to pay the substantial legal fees of a party who is not an indemnified party under the Wisconsin LLC Act and under the operating agreement. There's also no evidence to whom at Ballard's bar the promise was made. Perhaps we could extend reasonable inferences to Mr. Axelrod since he's the engagement partner and it was his declaration, but there's no evidence as to when the promise was made, how it was made. Was it an email? Was it a text message? Was it a telephone call? Was it more than one telephone call? And which engagements did it apply to? Was it the first time in August 2017 or was it the second time in January of 2018? And if it was the first in August of 2017, how could Greenpoint have promised to pay the fees for arbitrations that hadn't yet commenced until January of 2018? We also don't know what was the consideration for this promise. What was Greenpoint getting in exchange for this? And most importantly, as it relates to promissory estoppel, whether Ballard ever communicated that its willingness to take the engagement was conditioned on Greenpoint paying. There is no statement that Ballard's condition was ever communicated to Greenpoint, so how could it be Greenpoint's reasonable expectation that that promise would induce any action or reliance on behalf of Ballard? In addition to the fact that the invoices were sent to Mr. Hull in Madison, Wisconsin and not to Greenpoint in Milwaukee, the record also shows that someone other than Greenpoint paid some of these invoices. Unfortunately, given the very short time frame in which we had to take discovery, we didn't get all the information to show who made other payments, but we know it wasn't Greenpoint. With respect to promissory estoppel, there are three elements. The first and the third, there is simply insufficient evidence to affirm, I'm sorry, to reverse. The first, as I mentioned, the reasonable expectation that any promise would induce such action by Ballard Spahr. There's no evidence that any reliance, any intent on behalf of Ballard Spahr was ever communicated to anyone at Greenpoint, let alone Mr. Hull. And critically, with respect to the injustice element, the law provides that to enforce promissory estoppel, you must show that injustice can only be avoided by enforcing the promise, that that's your only remedy. But as we know, Michael Hull had an enforceable contract with Greenpoint. And to answer the court's question about attempts to collect and why wasn't Hull paying or why didn't they collect from him, we don't know. We would be speculating why they didn't attempt to collect from him, but what we do know is if you look at the SEC remedies opinion, at the time that Ballard was engaged in 2017-2018, Michael Hull was still taking significant management fees from the company. There was money there. That's in part why the SEC verdict was the way that it was, why that was part of the damages. With that, Your Honor, I see my time is up. Thank you. Thank you. Mr. Summers. May it please the Court. The invoices, there were approximately ten invoices that were paid by the debtors. The debtors scheduled a claim as being owed to Ballard in the amount of $230,000, which was close to the actual amount that was owed. Do you know who paid the other invoices? I do not know. I'd be speculating. I don't know the answer to that. But even if, let's assume it was Mr. Hull that paid the other invoices, it's still not necessarily, it doesn't evidence that there was a guarantee. Both could be primarily liar, right? We could be looking to both to pay, not that one or the other. We could be looking to both to pay. The engagement letter clearly says Mr. Hull is agreeing to pay. But beyond that, the oral agreement that's described in Mr. Axelrod's declaration would have made Greenpoint also primarily liable. Just because you can have co-obligors, even if it doesn't mean that one's a guarantee or not, and I think that's what we have here. So if it was Mr. Hull or another entity that Mr. Hull owned, it doesn't mean that there's a guarantee, as opposed to a primary obligation. Your Honor, I would also note that the declaration is clear that the agreement to pay was undertaken by the managing members, plural, and that's in paragraph 10 of the declaration. So whether it was Mr. Hull after having some sort of agreement with the other managing member, whatever that was, and the managing members act through people, right? So even though we have these layers of people, the two principles that were working here, that would be the only people that would be able to make the oral representation on behalf of the entities. We would ask that this Court reverse and remand this matter to the bankruptcy court for further proceedings. Thank you, Mr. Summers. Thank you. Thank you, Ms. Jansen.